```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
DARCY PERRY,

                      Plaintiff,         12-CV-0431(MAT)

           v.                            DECISION
                                         and ORDER
CAROLYN W. COLVIN, Commissioner
of Social Security,¹

                      Defendant.
_____
```

## INTRODUCTION

Plaintiff Darcy Perry, ("Plaintiff"), who is represented by counsel, brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Dkt. ##7, 9.

## BACKGROUND

Plaintiff protectively filed a DIB application on October 23, 2008, alleging disability beginning January 1, 1997, on the basis

---

¹ Carolyn M. Colvin is automatically substituted for the previously named Defendant Michael Astrue pursuant to Fed.R.Civ.P. 25(d). The Clerk of the Court is requested to amend the caption accordingly.

of multiple sclerosis ("MS"), depression,[2] and irritable bowel syndrome ("IBS"). T. 101-02, 116. Her application was denied on April 2, 2009, and a hearing before Administrative Law Judge ("ALJ") Robert Harvey followed on October 6, 2010. There, the ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from a vocational expert. T. 25-52.

In applying the familiar five-step sequential analysis, as contained in the administrative regulations promulgated by the SSA, see 20 C.F.R. §§ 404.1520, 416.920; Lynch v. Astrue, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps), the ALJ found: (1) Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured of June 30, 2002; (2) she had the severe impairment of multiple sclerosis; (3) her impairment did not meet or equal the Listings set forth at 20 C.F.R. 404, Subpart P, Appendix 1, and that she retained the residual functional capacity ("RFC") to occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk for six hours and sit for two hours in an eight-hour work day. The ALJ further found that Plaintiff could not work in areas of unprotected heights or around

---

[2] Although there is some mention of depression in Plaintiff's DIB application, a State Agency review psychiatrist concluded there was insufficient evidence to establish a medically determinable impairment, and there is no other record evidence to support such a claim. T. 38, 133, 196-97, 268-81. Plaintiff's motion also does not address any purported impairment that is not related to her physical conditions. Pl. Mem. 1-18. Accordingly, only her physical impairments are at issue in this Decision and Order.

heavy, moving, or dangerous machinery; climb ropes, ladders, or scaffolds, or exposed to cold or heat; and had occasional limitations in climbing, squatting, kneeling, balancing, and crawling; (4) through the date last insured, Plaintiff was unable to perform any past relevant work; and (5) considering her age, education, work experience, and RFC, Plaintiff had acquired work skills from past relevant work that were transferrable to other occupations existing in significant numbers in the national economy. T. 19-23.

An unfavorable decision was issued on October 21, 2010. The ALJ's determination that Plaintiff was not disabled became the final decision of the Commissioner when the Appeals Council denied her request for review on March 20, 2012. T. 1-6. This action followed. Dkt. #1.

The Commissioner moves for judgment on the pleadings on the grounds that substantial evidence supports the Commissioner's final decision that Plaintiff was not entitled to DIB. Comm'r Mem. (Dkt. #8) 1-23. Plaintiff has filed a cross-motion alleging that the ALJ failed to develop the record an apply the appropriate legal standards regarding the onset of limitations; the credibility assessment was legally erroneous and not supported by substantial evidence; and the vocational expert testimony did not provide substantial evidence to support the denial of benefits. Pl. Mem. (Dkt. #9-1) 1-18.

For the following reasons, the Commissioner's motion is granted, and the Plaintiff's cross-motion is denied.

## **DISCUSSION**

### I. **General Legal Principles**

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405(g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997).

When determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Brown v. Apfel,

174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Section 405(g) limits the scope of the Court's review to two inquiries: determining whether the Commissioner's findings were supported by substantial evidence in the record as a whole, and whether the Commissioner's conclusions are based upon an erroneous legal standard. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); see also Mongeur, 722 F.2d at 1038 (finding a reviewing court does not try a benefits case de novo).

Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). A party's motion will be dismissed if, after a review of the pleadings, the Court is convinced that the party does not set out factual allegations that are "enough to raise a right to relief beyond the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## II. Medical Evidence

### A. Treatment Records Prior to the Relevant Period

Plaintiff was diagnosed with MS in 1981, confirmed by MRI in June of 1987. T. 210-11, 218-20. Between 1985 to 2007, Plaintiff was treated by neurologist Dr. Svend Gothgen approximately twice a year, excluding an 8-year gap starting in 1990. T. 182-220.

Examinations leading up to the relevant period were largely unremarkable. In August of 1988, Plaintiff's symptoms were under control with "some problems off and on with her left side," which "most likely does not represent any new demyelinating activity." T. 209.

### B. Records Relating to the Relevant Period

#### 1. Treating Neurologist

A July, 1998 examination was "unremarkable" and Dr. Gothgen noted that Plaintiff was basically asymptomatic apart from headaches and menses-related discomfort. Her neurological status was defined as stable. T. 206.

Subsequent visits to Dr. Gothgen between 1999 and 2002 revealed mild symptoms, such as: numbness in lower extremities, mild hemiparesis resulting in a slight limp, and restless legs, and Plaintiff was otherwise "holding her own." T. 201-205. In 2001, Plaintiff complained of symptoms attributed to a "partially treated irritable bowel syndrome." T. 202.

#### 2. Treatment for Knee Injury

On February 16, 2001, Plaintiff received hospital treatment for an injury to her left knee. X-rays revealed a large avulsion medial femoral condyle and a subtle tibial plateau depression, requiring further examination by MRI or bone scan. T. 353-57. Plaintiff's knee was placed in an immobilizer and she was instructed to use crutches. T. 358.

**C.   Records Subsequent to the Relevant Period**

   **1.   Treating Neurologist**

Plaintiff continued to see Dr. Gothgen following her date last insured. In July of 2004, he noted moderate clinical symptoms in his reports, including intermittent Lhermitte's sign (electrical sensations), which were treated "reasonably well" by Clonazepam, and that Plaintiff was depressed and drinking too much which "[did] not make the situation any easier." T. 197-98. Plaintiff was prescribed Paxil but reportedly did not take it. T. 196-97.

In March 31, 2003, Dr. Gothgen reported that Plaintiff's MS had been "quite quiescent" over the course of almost 20 years with no major problems in sight. T. 194. Three months later, Plaintiff's condition was described as "static" with some problems in her left knee. She was referred to an orthopedic surgeon. Her examination was unchanged with a static mild right hemiparesis. T. 193.

Plaintiff reported back to Dr. Gothgen in October, 2003, who noted that Plaintiff was doing rather well with some ache from her knee that was relieved by a small dose of Naproxen. Her exam was unremarkable and her restless legs were under control with medication. T. 192.

Subsequent visits to Plaintiff's treating neurologist through June 2007 continued to show unremarkable or unchanged examinations, with her MS in stable or quiescent condition with no significant exacerbations. T. 182-197.

7

### 2. Treatment for Knee Injury

Plaintiff received treatment from orthopedic surgeon Dr. John Repicci for left knee pain starting in October, 2005. She underwent knee surgery in December, 2006, and Dr. Repicci noted that the surgery yielded good results. T. 175, 228-29, 230-36.

### 3. Primary Care Physician

Plaintiff also saw Dr. Frank Ferraro approximately seven times from March, 2008 to September, 2010, for MS monitoring, a hip condition, and psoriasis. T. 398-515, 516-23, 565-75.

Dr. Ferraro completed a "Multiple Sclerosis Residual Functional Capacity Questionnaire" on September 10, 2010, in which he reported that he saw Plaintiff every three months since June 4, 2002, and noted numerous symptoms, such as fatigue, balance problems, paralysis, sensory disturbance, bladder problems, heat sensitivity, difficulty remembering and solving problems, and depression. T. 594. He noted that Plaintiff was frequently in pain and incapable of performing low-stress jobs. T. 596.

With regard to limitations, Dr. Ferraro assessed that Plaintiff could only sit/stand/walk for 5 minutes at a time, for less than 2 hours total of an 8-hour work day. She could walk no more than one-half of a block before resting, and required an assistive device to stand and walk. T. 596-99. Plaintiff could not lift any item of weight, including those under 10 pounds. T. 600.

Plaintiff had multiple environmental restrictions, including heat, humidity, and respiratory irritants. T. 601.

Dr. Ferraro noted that Plaintiff had no exacerbations of MS in the past year. T. 595. The physician did not respond as to the earliest date that the stated symptoms and limitations applied, but later indicated that she had been limited since at least June 30, 2002. T. 596, 601.  He concluded that Plaintiff was "unable to work." T. 601.

### III. **Non-Medical Evidence**

Plaintiff was born in 1961, had a high school education, and attended college but did not graduate. T. 29-30, 120. She was previously employed as a home-care nurse in the 1990s, and again from 2005 to 2006. That position required her to lift 50 to 100 pounds, and remain on her feet most of the day. T. 39-40, 117-18.

Following a 2001 injury to her left knee, Plaintiff underwent manipulation to straight the leg and wore a brace for three weeks. T. 38. Following her knee surgery in 2006, she stated that her left knee hurt sometimes, but that her doctor said it was "fine" and did not require further surgery. T. 31.

Plaintiff testified that between 1997 and 2002, her MS caused fatigue and loss of balance on a daily basis, electrical shock sensations, numbness and tingling in her hands, and weakness in her legs. T. 34-35. She denied symptoms of blurry vision, pain, dizziness, vertigo, and chest tightness. T. 35.

She further attested to problems with spasticity, limping and staggering, but no paralysis or problems with seizures. Id. Plaintiff reported headaches three times per week associated with her MS. Id. Plaintiff told the ALJ she had problems with cognition, memory, and difficulty communicating. T. 36. Her medications were Avonex, aspirin, and multivitamins. T. 39.

With regard to her IBS, Plaintiff stated that she suffered from frequent urination and irritable bowel. Id.

Plaintiff testified about her daily activities, which included cleaning, laundry, vacuuming, sweeping, and mopping on a limited basis, and regular cooking, dishwashing, bed-making, and grocery shopping. T. 40-41. She did not take out the trash or do yard work, and could only carry limited packages. T. 41. Her hobby was reading. Id. Socially, Plaintiff went to church, visited with friends, and drove a car. Id. She performed self-care. T. 42. Plaintiff reported sleeping about three hours at a time. Id. She could lift a gallon of milk, but could not lift anything over 20 pounds, and could walk about 50 feet before it would be a problem. Id. Plaintiff stated she could only stand for 5 minutes, but did not have problems sitting or with her arms or hands. T. 43. Her ability to push or pull was limited; she could bend at the waist and lean forward but not squat or climb, and had problems kneeling and climbing. Id. Extreme temperatures exacerbated her symptoms,

and Plaintiff exercised, in addition to her medication, to relieve her pain. T. 45-46.

The ALJ also heard testimony from vocational expert Jay Steinbrenner, to whom he posed a series of hypotheticals regarding an individual with the same vocational profile as Plaintiff, who could perform light work, with the following limitations: (1) avoidance of unprotected heights and heavy machinery; (2) never climbing ladders, ropes, or scaffolds; (3) no exposure to cold or excessive heat; and (4) limited ability to climb, squat, kneel, balance, and crawl. T. 48-49. The vocational expert responded that such an individual could not perform Plaintiff's past work as personal care aide (medium, semi-skilled work performed at a medium to heavy exertional level), but could perform light, semi-skilled work such as teacher's aide. T. 49.

The ALJ posed a second hypothetical that involved the same facts with the additional limitations of lifting/carrying 10 pounds; sitting 6 hours and standing/walking 2 hours in an 8-hour day; and an occasional limitation in performing activities within a schedule; maintaining regular attendance; or completing a normal workday or week because of fatigue. T. 50. In response, the vocational expert stated that such a person would not possess any transferrable semi-skills. T. 50

Finally, the vocational expert testified that if the hypothetical were further restricted to sedentary work, such a

11

person would be unable to perform any unskilled jobs in the national or regional economy. T. 51.

## IV. **The Decision of the Commissioner that Plaintiff was not entitled to DIB was supported by Substantial Evidence.**

### A. Development of the Record

Plaintiff contends that the ALJ failed to consider the severity of her left knee and right hip impairments,[3] failing to adequately develop the record, and not properly considering the evidence with respect to those impairments. Pl. Mem. 10-16.

The Step 2 severity inquiry serves only to "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' ... [with] ... 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n. 12 (1987)).

With regard to Plaintiff's knee impairment, the ALJ noted Plaintiff's x-ray performed on February 16, 2001, which revealed a "large avulsion medial femoral condyle," "effusion in association,"

---

[3] The record evidence pertaining to Plaintiff's hip condition begins in August, 2009, seven years after Plaintiff's insured status expired. A September 2009 surgery report indicates that at that time, Plaintiff had a "one year history of increasing pain within her right hip." T. 377. She also testified that she had no other medical conditions during the relevant period other than MS. T. 38. There was therefore was no reason for the ALJ to address this impairment since it occurred outside the relevant period under consideration.

12

and "subtle tibial plateau depression not excluded." T. 22, 357. He then considered the 2005 records from Dr. Repicci in which he noted "severe, patellofemoral maltracking and lateral subluxation of the patella," and suggested conservative surgery. T. 22, 222. He concluded that this was not a severe impairment because while the record showed that Plaintiff had a tear of the left femoral condyle, she testified that the injury only lasted three weeks. T. 19, 38. Additionally, while her knee was briefly an issue of concern in the reports of Dr. Gothgen in October of 2003, subsequent to the insured period, those records indicate that a low dose of Naproxen helped the pain. T. 192-93. Plaintiff's knee impairment did not re-surface until her treatment with orthopedist Dr. Repicci, supra. Her hearing testimony indicates that although her knee still hurts from time to time, her "doctor said it's fine." T. 31.

There is no other evidence in the record pertaining to a treatment or allegation of left knee pain during the relevant period, and there is nothing in the record indicating that the 2001 knee injury resulted in significant limitations of Plaintiff's physical ability to perform the basic work activities. See 20 C.F.R. § 404.1521(b), Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3. Accordingly, the ALJ did not "ignore the evidence" relating to the knee impairment as Plaintiff contends. Pl. Mem. 11. The opinion here shows careful discussion of Plaintiff's knee

injury, and substantial evidence supports the ALJ's non-severity finding at step two of the sequential analysis.

In a related argument, Plaintiff contends that evidence of a degenerative condition existing years after the date last insured obligated the ALJ to further develop the record with respect to Dr. Ferrero, Plaintiff's treating primary physician. Pl. Mem. 11.

Here, the ALJ properly afforded Dr. Ferraro's retrospective opinion "little weight." T. 22. Not only were there no other medical records from Dr. Ferraro to support his opinion, but the opinion was also wholly inconsistent with the balance of the medical and testimonial evidence in the record. See Byam v. Barnhart, 336 F.3d 172, 183 (2d. Cir. 2003)("While a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence.")(internal quotation omitted). Significantly, Dr. Gothgen, Plaintiff's treating neurologist of nearly 20 years, found essentially no debilitating effects resulting from her MS during the relevant period. T. 201-06, 593-602.

The ALJ was not required to re-contact Dr. Ferraro for more information regarding the severity of her knee and/or hip conditions on or before June 30, 2002, because the evidence on this record was sufficient for the ALJ to reach a conclusion regarding whether Plaintiff was disabled. See 20 C.F.R. § 404.1520b (If there

is insufficient or inconsistent evidence presented to determine if the plaintiff is disabled, the ALJ will attempt to resolve the insufficiency or inconsistency by re-contacting the plaintiff's treating physicians or other medical sources to seek additional evidence or clarification, request additional medical records, conduct a consulting examination, and/or make further inquiry from lay sources). Rather, the ALJ relied on numerous reports made by Dr. Gothgen, Plaintiff's treating neurologist, and Plaintiff's own testimony indicating minimal limitations during the insured period. T. 21-22.

There are also no gaps in the record during the period in question that would require the ALJ to further develop the record and/or re-contact Dr. Fererro. See Rosa v. Callahan, 168 F.3d 72, 79 & n. 5 (2d Cir. 1999) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim").

Finally, the Court notes that the local disability office made four attempts to contact Dr. Ferraro in an effort to obtain additional documentation, to which Dr. Ferraro did not respond. T. 282-83. Thus, the ALJ was not required to re-contact Dr. Ferraro where a further attempt would be futile. See former 20 C.F.R. § 404.1512(e)(2) (effective prior to Mar. 26, 2012) ("We may not seek additional evidence or clarification from a medical source

15

when we know from past experience that the source either cannot or will not provide the necessary findings.").

In reaching his step two finding, the ALJ applied the correct legal principles and his determination was supported by substantial evidence in the record.

**B.  Credibility Assessment**

Plaintiff also challenges the ALJ's credibility determination, alleging that he did not apply the appropriate standards set forth in SSR 96-7p and 20 C.F.R. § 416.929. Pl. Mem. 16-17.

To establish disability, there must be more than subjective complaints. There must be an underlying physical or mental impairment, demonstrable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 416.929(b); accord Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983). When a medically determinable impairment exists, objective medical evidence must be considered in determining whether disability exists, whenever such evidence is available. 20 C.F.R. § 416.929(c)(2). If the claimant's symptoms suggest a greater restriction of function than can be demonstrated by objective medical evidence alone, consideration is given to such factors as the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness, and adverse side-effects of

16

medication; and any treatment or other measures used to relieve pain. 20 C.F.R. § 416.929(c)(3); see SSR 96-7p, (July 2, 1996), 1996 WL 374186, at *7. It is well within the Commissioner's discretion to evaluate the credibility of Plaintiff's testimony and render an independent judgment in light of the medical findings and other evidence regarding the true extent of symptomatology. Mimms v. Sec'y, 750 F.2d 180, 186 (2d Cir. 1984); Gernavage v. Shalala, 882 F.Supp. 1413, 1419 (S.D.N.Y. 1995).

"If the ALJ decides to reject subjective testimony concerning pain and other symptoms, he must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." Brandon v. Bowen, 666 F.Supp. 604, 608 (S.D.N.Y. 1987) (citing, inter alia, Valente v. Sec'y of HHS, 733 F.2d 1037, 1045 (2d Cir. 1984); footnote omitted).

Plaintiff claims the ALJ "cited minimal daily activities and summarized the evidence, but did not provide a rationale as to the reasons finding her less than credible." Pl. Mem. 17. The Court disagrees with this assertion. The ALJ cited several daily activities, which included performing household chores, cleaning, shopping, socializing, and driving. T. 21. He explained that her allegations of disability were inconsistent with her allegations of daily living, thereby providing a rationale for his credibility

finding. Id. Moreover, the ALJ considered Plaintiff's testimony that her left knee injury only lasted three weeks, and noted her medications (a trial course of Interferon and a short round of steroids), as well as their effects. T. 19, 21, 22. The ALJ also thoroughly discussed the medical evidence, which included the diagnostic findings and reports from Drs. Gothgen, Repicci, and Ferraro. T. 21-22. The objective medical evidence in this record, which was largely consistent save for Dr. Ferraro's restrictive RFC questionnaire, did not corroborate Plaintiff's allegations to the disabling extent alleged on or before June 30, 2002.

The Court therefore finds that the ALJ's credibility determination was proper as a matter of law and supported by substantial evidence in the record.

**C. Vocational Expert Testimony**

Plaintiff broadly argues that "due to the errors above, the vocational expert testimony cannot provide substantial evidence to support the denial." Pl. Mem. 18.

The Court has rejected all of Plaintiff's previous arguments and finds that the ALJ's residual functional capacity finding was supported by substantial evidence. Having reached this determination, the Court finds no error in the ALJ's step five conclusion. See Wavercak v. Astrue, 420 Fed.Appx. 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record

18

evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

## **CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt.#7) is granted, and Plaintiff's cross-motion for judgment on the pleadings (Dkt.#9) is denied. The ALJ's finding that Plaintiff was not disabled during the insured period from January 1, 1997 to June 30, 2002, is supported by substantial evidence in the record, and accordingly, the Complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

MICHAEL A. TELESCA
United States District Judge

Dated:   Rochester, New York
         April 29, 2015